4090589. Council please. Thank you, Your Honor. Brad Elbert on behalf of St. Mary's Hospital. Before I get into the argument as a whole, I think it might be wise if we limited our discussion on the fees that were awarded with respect to the medical in this case. In other words, what we're saying is, we're not conceding that our actions were vexatious by any means. We think that what happened here is a result of the case as a whole and a lack of a sense of urgency and conduct by both parties. But for the purpose of the appeal, what we would like to do at this point, from this point further, is to limit our discussion to the issues of the appropriateness of the penalties and attorney's fees on the medical and the attorney's fees with respect to the medical. And what that does is it takes out of play the 19L penalties of $2,500, takes out of play the 19K penalties on TTD, takes out of play the small amount of attorney's fees under Section 16 that were associated with those, which is approximately $3,700. I think it's $3,696.67. I would urge the Court to confirm those numbers just to make sure that my calculations are correct. Were you conceding on the 19K on the TTD? I'm sorry? Yes, the amount, Your Honor. Yeah. So, the amount on the TTD is $5,140.86. Now... Were you conceding on the 19K on the death? The 19K would relate to the TTD and to the outstanding death of $10,842.46. What we'd like to limit our discussion to today is the actions in this case as they relate to the payment of the medical bill. The position that we've maintained all along is that for an employer to have to bear the burden of maximum penalties, full penalties, in a case where at the time of the hearing all benefits, I believe all, but about $2,500 in medical were paid, the TTD, et cetera, the permanency of the death benefits were taken care of, in a situation where the letters that we presented to the court, to the arbitrator, showed there was no sense of urgency by either party to resolve this case. This is a case where I think the delay can be the place of the burden of the feet of both parties. In that situation where the parties equally contribute, we think it's unfair and an abuse of discretion to in this particular case to award 19K penalties based on the outstanding medical. Now, to back up for a second, the accident in this case took place in early 2003, and the claim, the medical aspect, was turned over to the husband's insurance carrier through Caterpillar. And the medical bills were paid at that time through Caterpillar. The claim was handed over to the Crawford & Company for evaluation, and we were dealing with a patient going into the hospital for work that morning. So she really wasn't traveling in the sense that she was going on a nursing visit or to visit a patient or a client. She was returning, she was going to work just like we do every day. And the law is fairly clear that in that situation, at least generically, when I go to work in the morning, that's not a compensable act. So there were reasons for the delay in the evaluation of the initial claim. The claim, as the record shows, was eventually When did you determine it was compensable? It was eventually determined to be compensable, according to Ms. Beam, about six months or so, as she put it, after the filing of the claim. And the claim was filed in September of 2003. June of 2004? That puts us in the late March-April time frame of 2004. And then, as you point out, in June of 2004, there was an acknowledgment by Mr. Luther, who was our trial counsel in this case, that the deposition of one of the doctors, I think it was C. Sean, would not be necessary because we were not going to be denying the claim on the basis of compensability. The problem that we had in this case, with respect to the medical, is we didn't have the bills to process. We requested those, as the record indicates, the petitioner filed a 19B petition every month, noticed it up, never called it for hearing, attached a summary of the medical bills, but did not actually attach the medical bills, did not give any indication of how to process those. And while the Court is obviously saying, well, if you've accepted this claim, why aren't you paying the bills, we still have to have the bills in order to pay those. Let me ask you a question. Sure. Your brief makes arguments, does make refer to citations, in the record which support the argument. I'm sorry? Your brief makes arguments, and it does not cite to the record to support the argument. Is there a particular question I can try to answer? Well, you can if you want to go to page 14 of your brief. I don't know if you'd want to spend all that time on it, but it does not refer to any citation to the record, taking the second full paragraph, page 14. I apologize for that, Your Honor. I should have done that. The letters that we are referring to that provide the basis for our defense in this case essentially come from Petitioner's Exhibits 6-25, 6-30. And what those exhibits show, I know there's a large number there, but they're generally one-page letters, and they show the conversations back and forth between counsel. And what do they show in this case? They show a lack of a sense of urgency by either party. They show a failure by the petitioner to respond to Petitioner's counsel. And I'm not picking on counsel here today. He didn't try the case. But there was a lack of response to requests regarding average wage, regarding providing medical. Are you trying to say the employer is free of any errors of how they operated with respect to this case? No, and that's why we made the concessions when we began. All right, the concession. Let me get clear on the concession. You are not objecting to the penalties with respect to the TTD, the reimbursement of medical expenses, and the death benefits? No, the issues that we're removing from contention on the appeal are 19L as a whole, the TTD penalties, death benefit penalties, and the attorney's fees. Was that born right before the TTD? After the TTD. The TTD, the death benefit penalties, and the attorney's fees that are related to those. That comes to approximately $34,000. And it's our position that in a case where the medical bills are not provided to the carrier, they're turned over to a group, they're paid by the group. So we have very limited exposure by the petitioner. And I'll address the out-of-pocket in a second. Where we've got the employer making reimbursements to every one of those providers, paying the liens prior to the ultimate hearing in this case. Where we have attempts by the employer to contact in early 2005 the medical providers that were finally identified. And the providers come back and say, well, we can't release this information to you as a work comp carrier. This claim is not listed as a work comp claim. That's in Respondents Exhibit 26, is a letter that we sent to opposing counsel asking them to execute some forms that would allow us to obtain the medical records. Because several of the providers were saying, this isn't listed as a comp case, we can't release the records to you. So when you look at all the things that took place in this case, you look at all the correspondence. And the employer didn't even know this was a comp case? Pardon me? The employer did not know this was a compensation case? Well, the employer was treating it as a comp case at that time. What I'm saying, Your Honor, is that the medical providers did not have in their records an indication that this was a workers' comp case. So they would not release the medical records to the employer when the documents were finally requested from the medical providers. And that's in Respondents Exhibit 26. And that highlights that point. When did you request those records? The record doesn't specifically say when they were requested, but it would have been before July of 2005, because in July 12, 2005 was when we sent the letter saying we can't get these documents, we need the authorizations. Your opponent says that you were notified of $240,000 worth of those expenses with a petition for rehearing on January 26, 2004. We were notified of the amounts. We were notified of some of the providers in a summary. I believe it was an attorney-prepared summary. There were not actual bills that I could see in the record that I found that were provided. When was the first time you requested bills from these providers after January of 2004? The best answer I can give is my summation from this record would have been prior to July 12, 2005, but it does not appear that it was before 2005. Again, when we look at this record, we understand that there were delays. We understand that this is not the typical case, but when you look at the tone of the conversation between the attorneys, the fact that they never called any of their petitions up, which is basically how they practice. They file them and they don't call them up. When you look at the fact that there were settlement negotiations and efforts that took place towards the end of 2004, Respondents' Exhibits 16 through 18 indicated that there were discussions with Petitioner's Council. There were discussions at the call, Mr. Luther and Petitioner's Council, and finally those fell through. And I think it was October or November of 2004 when Petitioner's Council said, no, we're not going to settle this case. We're going to move forward and try the final issues. This is not a case where you can come back and say, well, this was vexatious with respect to the We don't think that this case is one where the petitioner should be allowed to not respond, not cooperate, not push any issues, and then come back at the end and say, we get penalties and fees with respect to the entire amount of medical. We think that the decision of the Commission with respect to the medical award, and again, that's related to the penalties and attorney's fees, is an abuse of discretion against the manifest way of the evidence. I think you could apply either standard in this case. We cited authority for both. Again, this is an odd case. Obviously, when you read the Commission's decision, it was a heated argument at the Industrial Commission. I think they had their mind made up when we walked in, based on the tone of the questions that they fired at us. We just asked this Court to take a look at this case objectively and say, are we going to impose full It's clear from the record that the parties were not pressing this matter urgently. The petitioner didn't avail himself of the various means he could if this was truly an urgent matter. I think there are matters that are outside this record that might explain this, but they're not in the record, and so we can't get into things. But I think the record itself does provide sufficient support for us. You couldn't convince Nancy Lindsay of your position? She did not. Well, that's true. She did not go along with us. It was a 3-0 decision that affirmed the penalties in all respects, yes. And the standard of review of the Commission's decision, what's the standard of review with respect to these penalties? Typically, it's a manifest way of the evidence, but we cited the NAMSTAR case with respect to the amounts. It also talks about it can be an abuse of discretion because the Commission is empowered with the We believe that the finding with respect to the medical is against the manifest way of the evidence. Alternatively, it's an abuse of discretion. Thank you. Thank you. Counsel, please. May it please the Court, good afternoon, Your Honors. My name is Tommy Strau here today on behalf of Vicki Briner and her dependents and husband and child, Casey and Eugene Briner. Your Honors, I would do a service to this case and to our position for me to act over the self-righteous about the issues, even the briefs back and forth to the appellate court, particularly at the lower courts, but even the appellate court has a lot of hyperbole in them. But the first thing that I want to do is address a factual, what I think is a misstatement by opposing counsel today, and that is when the claim was first accepted by Rosemary Deem, the insurance adjuster. If you look at the commission decision and the arbitrator decision, they say that the evidence shows that the insurance adjuster accepted the claim approximately when the claim was filed, six months, which would have been September, roughly, of 2003. Now, in the statement of facts portion of the brief, they say, no, it was six months after the claim was filed. I didn't contest that in the written brief, but in preparing for this again today, I looked at this again and I believe the commission and the arbitrator were right. That what, if you particularly look at the redirect examination, the first question that Attorney Kevin Luther asked him was being, he says, so, after this accident, perhaps sometime later, perhaps six months later, the powers that be, as he puts it, decides that this is going to be a compensable accident. The most reasonable interpretation of that statement is that it is six months after the accident that this claim was deemed to be compensable, not six months after the claim was filed. I mean, the language that she uses is that it's six months after the claim starts. But when does the claim start? Is it at the accident date, or when the petitioner files their case with the work non-commission? And so, if you add that into the factual mix here, I believe that it makes the respondent's position that much more unreasonable. Now, the opposing counsel mentioned various times that there was no sense of urgency by the petitioner's counsel in this case. Well, what's the urgency? You have a... Well, tell us. What is the urgency? You have a... Well, the urgency was for the Breiner's family. All right. What did your opponent mean when he said that the claimant didn't call it for hearing? Well, it was noticed for hearing, as was mentioned. Now, again, the urgency is that their wife and their mother is in a coma. Who did you call for hearing? Not initially. And, again, the immediate concern of the Breiner's is that their wife and their mother was in a coma, and those bills had to be paid. And for some reason, depending on how you look at the facts, it took either six months or a year for the respondent to figure out that a traveling nurse on the way to the hospital was entitled to benefits. But what did you do about it, trying to get it set for hearing or have a hearing on it? Well, originally the deposition was set at Dr. Sikon, which opposing counsel mentioned. And it was when we first got the letter in June of 2004 that the claim was compensable, and they said you don't need to take the deposition. As I point out in my brief, let's look at it from that point on. We officially got notice on June of 2004 that this claim was compensable. Why should we be having to force this down their throats to take this case to hearing and have them pay the benefits that they've already admitted that they owe? They should just be paying it. They've been telling us it's acceptable. The other side of the coin, why didn't you go in and get an order? At that point, Your Honor, again, I wasn't the trial counsel, so I can't particularly say exactly why the decision was made. But again, at that point, I suppose there were some settlement negotiations. But again, settlement negotiations in no way absolves the respondent of the responsibility to pay timely benefits. They clearly had the information in January of 2004 of the medical providers. They told this court today that, well, the response was that this wasn't a workers' compensation case. But they can subpoena the records. They could have done this at any time. They chose not to do it for whatever reason. And, I mean, again, as far as why wasn't the case taken to hearing until September 2005, I don't know. But again, why should you have to? I mean, really. I mean, because they did start paying benefits. Really, you have to if you want to get paid. Well, they did start paying benefits in early 2005, in the spring, when they started paying the death benefits. So at that point, it looked like, okay, maybe they're going to get the case in line. Again, by that time, the carrier for the husband's insurance had paid the majority of the bills, although Mr. Briner had paid almost $23,000 out of his own pocket for this medical treatment. And so, again, you had part of the case going. Now, if it takes them a year and a half, almost two full years to get benefits paid here, you don't have to ask for penalties during that first year in order to have the penalties awarded. The penalties are awarded on the basis of the entirety of their behavior from when this accident first happened up until we took it to hearing. I don't see that there was the responsibility, once the benefits were starting to be paid, to take the case to hearing. Again, once you decide that it's ready to go, you take your case in front of the arbitrator and you ask for penalties, which is what happened here. Again, what the respondent is trying to say is that, again, as long as the petitioner's husband's insurance company is covering some of the bills while she's in a coma, because obviously when she's in a coma for a year, these bills have to be paid, that somehow absolves them of the responsibility of providing timely benefits. And it doesn't. Again, what is she supposed to do? What is the family supposed to do if it takes the insurance company a year to figure out that this is compensable on what should have been a very straightforward case? They have to use the group insurance, so why hold that against them? Again, the totality of the evidence here, when you're looking at either abuse of discretion or a manifest weight of the evidence standard, there's nothing that petitioners' counsel did that, as they put it, sky meets their efforts to pay benefits on an average weekly wage. They have access to a wage statement. To designate a party, they can write a check to the estate of Vicki Briner. There's nothing that petitioners' counsel did that in any way stood in their way of paying timely benefits. And the purpose of additional compensation or penalties is to create a disincentive for certain kinds of behavior, clearly. And again, when you have an accident victim like this, who's in a clearly work-related injury, dies a year later and has been in a coma the whole time, that not a single penny on the case is paid until almost two years after the accident. Economics 101 is people respond to incentives. The reason that five people that have individually looked at this case believe that the respondent deserve the full amount of penalties, because they thought that was unreasonable. And they have to create a disincentive for the insurance companies to do that and to take advantage of discounts by group carriers and the like. And based on that, Your Honors, we respectfully request that the commission be upheld. Again, the standard, no reasonable person could have decided this. Well, five people have decided in favor of petitioners. And all five of those would probably be very interested to know that they're not reasonable. And at the very end of this, if Your Honors notice, five attorneys from the closing counsel's firm signed off on this brief. And that's looking at the seriousness of the case and the fact that it's several hundred thousand dollars worth of penalties. All it really would have taken in this case to avoid being here is for one attorney in that firm to have had the same seriousness about the case back in May or in March of 2003 when this accident happened. Thank you.  Rebuttal, please. I'd like to address a couple of quick comments that he made with respect to the record. First of all, he's talking about when this claim was first accepted. The court had asked about that. If you look at page 38 of the transcript, which is where Ms. Beam addresses that, the decision to make the claim compensable was made six months or so after the claim started. That's not an exact quote. That's a summary of the documents in there. But I would say that's backed up by Respondents Exhibit 23, which is a letter from Mr. Luther to a closing counsel. Respondents Exhibit 23, March 25, 2004. It says, painting our client's decision on compensability. That dovetails perfectly with what Ms. Beam testified in our interpretation that six months after the claim was filed in September. That almost perfectly matches. The court asked counsel, why didn't you do something? They said, well, what are we supposed to do? Well, the rules provide that if something is urgent and they want to bring it to a head, they file a 19B. And they filed one almost every month in this case. And they never called it up for hearing. It wasn't until the very end. Now, why did this case go to hearing? They filed a claim. They had death benefits. They had other things. They had future death benefits. They had to bring the case to a resolution. They said they weren't going to settle it on a lump sum basis. And so other than having a settlement contract, I guess that would say we agree to pay pursuant to the act, et cetera, you've got to have an arbitrator's decision that addresses those issues and puts them in informality. Well, what would happen if the employer five years down the road is making these death benefit payments and says, I'm not going to pay anymore? Well, at that point, they've got a judgment. They've got a commission decision they can file a 19G on. That's why they went to trial. And they bring the penalties petition in that they've had on file since 2003 and never called up. Let me ask you a practical question. From a practical standpoint, once the company deemed the claim compensable, what are the risks by paying the accrued TTD and the death benefits? What was the risk? Your Honor, the record doesn't assess that. And that's one of the reasons why when we looked at the issues, when I looked at the issues getting ready for this, I decided that based on the standard review, we decided not to further contest the penalties with respect to that. Right. They would have received credit for the amount paid had they prevailed on the petition, correct? You're correct. You're correct on that aspect. Yes, absolutely. Now, there are a couple of comments that were made. Essentially, that certain activities by us did not absolve us of liability. Well, I don't think that was what really was being sought. The fact that we enter into settlement negotiations, everybody knows that doesn't absolve us of liability or obligations under the Act. But what it does show, it does show that we were engaging in trying to resolve this claim in good faith. There's a letter from Mr. Luther to opposing counsel where he indicates to Mr. Farrakuti's office that he's willing to work for his resolution. It's Petitioner's Exhibit 8D, R1129. It acknowledges that one of his 19 B's is on file and says we continue our efforts to resolve and work to resolve this litigation. So, clearly, Mr. Luther is saying that he's willing to work to try to resolve this. Yes, this case went on longer than it should have. Yes, it wasn't a pristine model that we would hold up. But what we're saying, what we're asking this Court is to look at the record, the lack of urgency, and look at the actions of both parties when we're talking about penalties. And attorneys' fees on this medical. The medical 19K penalties were $147,000. And if the Court were to take the penalties and fees that we've discussed and are no longer addressing, we're looking at approximately $35,000, $34,000 in attorneys' fees and penalties for this case. We think that that's reasonable under the circumstances and we ask you to look closely at it. And one last thing, I mentioned something in my main argument and I didn't get back to it and I apologize. On the issue of out-of-pockets, you'll note that the response that Mr. Luther filed to the penalties petition indicates that we went ahead and paid that $23,000 just prior to the arbitration date. As he puts it in there, based on unsubstantiated or undocumented references that he in fact incurred those. And I think that itself is another example of the fact that there was not vexatious conduct in this case. Did it go on too long? Yes. Was it vexatious? No. Thank you very much.